# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**SWISHER INTERNATIONAL, INC.,**

      **Plaintiff,**

    **v.**                  **Case No.:3:05-cv-871-J16-TEM**

**MIKE JOHANNS,**
**SECRETARY OF AGRICULTURE,**

      **Defendant.**

_____/

Before the Court are Defendant, Mike Johanns, the Secretary of the United States Department of Agriculture's Motion for Summary Judgment (the "Motion") (Dkt. 24), with incorporated Memorandum of Law and supporting affidavits.[1] Plaintiff, Swisher International Incorporated ("Swisher") filed a Response and Cross Motion for Summary Judgment (the "Cross Motion") (Dkt. 34) with the parties' Stipulated Facts (Ex. 1) and supporting affidavits. Also before the Court are Swisher's Reply (the "Reply") (Dkt. 35) and the Secretary's Reply to Response (the "Response") (Dkt. 37). The Court granted Swisher's Request for Oral Argument. (Dkt. 38). A transcript of that proceeding is on file with the Court. (Dkt. 43).[2]

---

[1] Hereinafter Mike Johanns will be referred to as the "Secretary" and the Department of Agriculture shall be referred to as either the "Department" or "USDA."

[2] References to that transcript will be designated as Dkt. 43 at p.__.

## I.       Procedural Background

After exhausting its administrative remedies,[3] Swisher filed a four-count complaint (the "Complaint") (Dkt. 1) against the Secretary in his capacity as head of the Department on September 13, 2005.

## II.      Factual Background

Swisher, a Delaware corporation with principal operations located in Jacksonville, Florida, manufactures small and large cigars and some smokeless tobacco products. (Dkt. 34, Ex. 1, ¶ 2). Swisher alleges that regulations implementing the assessment provisions of the Fair and Equitable Tobacco Reform Act of 2004, 7 U.S.C. §§ 518 et seq. ("FETRA") are inconsistent with FETRA, in violation of the Administrative Procedure Act (the "APA"). Swisher further alleges that FETRA and its implementing regulations violate the Takings and Due Process Clauses of the Fifth Amendment and principles of Equal Protection.

FETRA comprises part of the American Jobs Creation Act of 2004, which was signed into law by the President on October 22, 2004.[4]   Pub. L. 108-357.  FETRA repealed the tobacco marketing quota and related price support programs authorized by Title III of the

---

[3] On June 23, 2005, pursuant to Department regulations, Swisher paid its assessments under the Fair and Equitable Tobacco Reform Act of 2004, which were levied for the first two quarters of fiscal year 2005.  Swisher also filed objections regarding the impropriety of the assessments. On July 12, 2005, the Department sent Swisher a letter rejecting Swisher's objections.  The letter informed Swisher that the administrative appeals process could not be used to "challenge statutory or regulatory provisions or any mathematical formula or other procedure or policy that is generally applicable to all similarly situated participants." (Dkt. 1, ¶ 89).

[4] Sections 611-613 of the American Jobs Creation Act of 2004, codified at 7 U.S.C. § 518 (West 2005).

Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949, transforming tobacco production into a free market system at the end of the 2004 crop year.[5]

In order to assist with the transition from the highly regulated market to the free market, FETRA provides for a "buyout" of tobacco farmers and tobacco quota holders (the "producers") based on their historic quota levels.  The buyout, titled the Tobacco Transition Payment Program ("TTPP"), is annualized and paid over ten (10) years.  It is projected to cost $9.6 billion and is funded through quarterly assessments on tobacco product manufacturers and importers (the "manufacturers") imposed by the Secretary through the Department's Commodity Credit Corporation ("CCC").  The CCC deposits the quarterly assessments made under the TTPP into a revolving trust fund, the Tobacco Trust Fund (the "TTF"), which Congress created specifically to carry out the Act's purposes. 7 U.S.C. § 518(e)(a).[6]

Under FETRA there is a two-step process to determine a manufacturer's quarterly assessment.  First, the overall amount needed to make transition payments to producers is allocated among the six classes of tobacco set out in FETRA, i.e., cigarettes, cigars, snuff, roll-your-own, chewing and pipe ("Step A").  7 U.S.C. § 518(c)(1).   Second, within each class, the amount required to be paid by each manufacturer is allocated on a pro rata basis based upon each manufacturer's share of gross domestic volume as calculated under the

---

[5] Under the now repealed tobacco quota program, the price and supply of tobacco grown and sold in the United States was regulated.

[6] The CCC's authority to make assessments under FETRA "terminates on September 30, 2014," 7 U.S.C. § 518(d)(k), and FETRA limits the trust fund expenditures to $10,140,000,000. 7 U.S.C. § 518(f).

statute ("Step B"). 7 U.S.C. § 518(e).

By statute, the assessments began in fiscal year ("FY") 2005 and conclude in FY 2014. 7 U.S.C. § 518d(b)(1).  For FY 2005, FETRA established the Step A allocation. 7 U.S.C. § 518(c)(1).   For the ensuing FYs, the Secretary is directed to "periodically adjust the percentage . . . to be assessed against . . . the [manufacturers] of each class of tobacco product . . . to reflect changes in the share of gross domestic product volume held by that class of tobacco product."  7 U.S.C. § 518d(c)(2).  For Step B determinations,  the shares payable by the cigar and cigarette classes are based on the gross domestic volume as measured by the number of cigarettes and cigars "removed from bond" and placed in domestic commerce.  7 U.S.C. § 518d(e)(1).  To determine the final assessment for each manufacturer within a certain class its Step B figure is multiplied by the assessment amount assigned to the relevant class under the Step A process.  7 U.S.C. § 518d(f).  See also the Johnson. Decl., Dkt. 24, Ex.1, ¶ 11.

Pursuant to FETRA, the CCC issued regulations governing the process for assessing manufacturers. See 7 C.F.R. §§ 1463.1 et seq. Those regulations, titled the Tobacco Transition Program, are codified at 7 C.F.R. §§ 1463.1-1463.201.[7]

Under the implementing regulations, CCC makes an annual determination of the national assessment, which is then "split up" on a class wide basis (Step A) based on the CCC's determination of each class's share of total excise taxes paid on tobacco products

---

[7] FETRA required that the regulations be promulgated without regard to the notice and comment provisions of 5 U.S.C. § 553.  7 U.S.C. § 642(b).

under 26 U.S.C. § 5701 in a manner that complies with FETRA. 7 C.F.R. §§ 1463.4, 1463.5. For large cigars, the excise tax rate varies, subject to a statutory cap. To determine relative market share, the Department uses the maximum excise tax rate assigned. For all other tobacco types, the Department determines each tobacco class's relative market share using actual excise tax rates. Following that, each class's assessment is further divided among the individual manufacturers (Step B) based on domestic market share as determined under FETRA, and the total assessments are calculated. 7 C.F.R. §§ 1463.7.

Each entity's Step B percentage of the class's portion of the assessment is calculated using the relevant volume for the manufacturer. Excise taxes for products other than cigars and cigarettes are calculated based on weight. For cigars and cigarettes, FETRA requires the CCC to rely on the number of units removed to determine each company's Step B share of the class assessment. Therefore, volumes for cigarettes and cigars are reported on a "per stick" rather than a weight basis.

In summary, under FETRA regulations, each manufacturer is assessed an amount based on (1) the total amount of money needed that quarter to fund the TTPP; (2) the percentage of the total assigned to that company's class of tobacco products, and (3) that company's share of the total volume of domestic sales for that class based on volume, as measured either on a pound or stick basis. As of the filing of the Motion, Swisher has paid over $11 million dollars in FY 2005 in FETRA assessments. Admin. Rec. at 676.[8]

---

[8] Swisher claims that over the ten-year period of FETRA, Swisher is likely to have to pay in excess of $100 million dollars. (Dkt. 34 at p. 7). Although, as will be demonstrated below, this figure is not statutorily "set in stone."

## III.    Applicable Standards

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987); Edwards v. Acadia Realty Trust, Inc., 141 F. Supp. 2d 1340, 1344-45 (M.D. Fla. 2001).  The Court will construe the record and all inferences that can be drawn from it in the light most favorable to the nonmoving party, and the moving party bears the initial burden of establishing the absence of a genuine material fact.  See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Samples on Behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Once this burden is met, however, the opposing party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 342.  The Eleventh Circuit explained in Samples that the opposing party need only present evidence from which a jury might return a verdict in its favor in order to survive the moving party's motion for summary judgment.  See Samples, 846 F.2d at 1330; see also Augusta Iron & Steel Works v. Employers Insurance of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

Notably, the Supreme Court pointed out in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), that the moving party's burden only extends to facts that might affect the outcome of the lawsuit under the governing law, as "[f]actual disputes that are irrelevant or

unnecessary will not be counted."  Summary judgment will only be granted if all facts and inferences point overwhelmingly in favor of the moving party, such that a responsible jury could not find in favor of the opposing party.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  If there is conflicting evidence that will permit differing reasonable inferences, the case will be submitted to the jury.  See Augusta Iron & Steel, 835 F.2d at 856.

When considering cross-motions for summary judgment, the court evaluates each motion under the same standard.  Cubic Def. Sys. Inc. v. United States, 45 Fed. Cl. 450, 457 (1999).  If genuine disputes exist over material facts, both motions must be denied.  Mingus Contractors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

## IV.   Parties' Arguments and Analysis

### Arguments

Swisher raises four objections to the FETRA assessments.

### A.   Takings

Swisher alleges that FETRA violates the Takings Clause by requiring Swisher to make payments to the TTF.  (Dkt. 1, ¶¶ 93-94).  Specifically, Swisher claims that FETRA effects a direct transfer of money from manufacturers to private individuals, in this case, producers (Dkt. 1, ¶ 52).  The Secretary claims that what Swisher describes as a taking is "nothing more than a tax." (Dkt. 24 at p. 8).  The Secretary claims that FETRA was passed as part of a tax bill, the American Jobs Creation Act of 2004, 26 U.S.C. §§ 199 et seq., and that FETRA simply creates an obligation for manufacturers to pay money to the government.

The Secretary further claims that the Takings Clause can be applied to the payment of money to the government only where "a specific fund of money is at issue . . . ." (Dkt. 24 at p. 9). The Secretary claims that in the "absence of such specific, articulable, funds of money, there can be no Takings Clause claim based on an obligation to pay or be paid money." (Dkt. 24 at p. 9).

In support of this contention, the Secretary claims that "several federal courts have recognized that in Eastern Enterprises v. Apfel, 524 U.S. 498 (1998), a majority of the Supreme Court held that the obligation to pay money cannot be considered a taking under the Takings Clause. (Dkt. 24 at p. 9). The Secretary characterizes the Eastern Enterprises case as follows:

> In Eastern Enterprises, a four-justice plurality decided that the Coal Act unconstitutionally required a former operator of a coal mine to fund health benefits for retired miners who were former employers . . . . But, Eastern Enterprises was decided by a fractured court. Justice Kennedy, in his concurrence, disagreed with the plurality's conclusion that the Coal Act constituted a taking . . . . Rather, he would have decided the case on due process grounds . . . . The four dissenters rejected the notion that a Takings Clause analysis applied because the case involved "not an interest in physical or intellectual property, but an ordinary liability to pay money. . . ." Thus, five justices agreed that regulatory actions requiring the payment of moneys are not takings. . . .

(Dkt. 24, pp. 9-10 (internal citations to Eastern Enterprises omitted)).

Swisher responds that "in an effort to duck the Takings Clause analysis altogether, [the Secretary] asserts that Takings Clause scrutiny is inapplicable here because FETRA is 'nothing more than a tax.'" (Dkt. 34 at p.15). Citing Eastern Enterprises for support, Swisher engages in a takings analysis using the three-part test set forth in Connolly v. Pension Benefit

Guar. Co., 475 U.S. 211 (1986), which is fully articulated below.  Swisher further argues that

the Supreme Court has "repeatedly held that an obligation to pay money can be struck down

under the Takings Clause." (Dkt. 34 at 19, citing to Phillips v. Washington Legal Foundation,

524 U.S. 156 (1998) and Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155 (1980)).

Lastly, Swisher claims that the Secretary's attempt to distinguish Phillips and Webb's on the

basis that in those cases a "specific fund of money [wa]s at issue" is "nonsensical." (Dkt. 34

at p. 19, citing to Dkt. 24 at p. 9).

In the Reply, the Secretary first claims that the FETRA assessment constitutes a tax

under the three-factor tax vs. regulatory fee test set out in San Juan Cellular Telephone Co.

v. Pub. Serv. Comm'n of Puerto Rico, 967 F.2d 683, 685 (1st Cir. 1992).[9]  The Secretary

further claims that even if the FETRA assessments were not taxes, the Secretary would still

prevail on Swisher's constitutional claims because the Takings Clause does not apply to the

payment of money to the government unless a specific fund of money is at issue.

In the Response, Swisher argues that the three-factor test employed in San Juan

Cellular, in fact, confirms "unmistakably that the FETRA assessments are regulatory fees and

not 'taxes.'" (Dkt. 37 at p. 4).  Swisher reiterates in the Response that under the regulatory

takings analysis FETRA's assessments are unconstitutional  Finally, Swisher also claims in

the Response that the takings analysis is applicable because in this case, there is a particular

---

[9] In San Juan Cellular the court set out a three-factor test to determine whether a case involves a tax or regulatory fee under the Tax Injunction Act, 28 U.S.C. § 1341, which precludes federal courts from enjoining collection of any tax under state law.  The three factors are whether the payment is: (1) imposed by an agency or the legislature; (2) imposed upon those being regulated or the community as a whole; and, (3) for the purpose of defraying regulatory costs or to raise revenue.

fund of money at issue, which is the "very specific amount of money that the USDA has assessed and collected from Swisher under FETRA . . . ." (Dkt. 37 at p. 10).

### B.     Due Process

Swisher claims that by enforcing FETRA, the Secretary has deprived Swisher of property without due process of law. (Dkt. 1, ¶¶ 98-100).  In support Swisher claims that FETRA unfairly imposes assessments on it, and all manufacturers, without regard to those companies' involvement or non-involvement in the old quota system. Swisher claims that during the last ten years it purchased over 99% of its tobacco outside of the United States (Dkt. 1, ¶ 5) and only purchased minute quantities of quota tobacco. (Dkt. 1, ¶ 23).[10]

In the Motion, the Department claims entitlement to summary judgment on Swisher's Due Process claims because a Congressional Act does not violate the Due Process Clause if it is rationally related to a legitimate public purpose and, in this case, the assessments levied under FETRA are rationally related to a legitimate public purpose.  The Secretary claims that among other reasons, "Congress could have concluded that it was good, discretionary public policy to help farmers transition from the old tobacco quota and price support systems and prepare to operate for the first time in an environment where prices are market-based.  (Dkt. 24, pp. 11-12, citing to 7 U.S.C. §§ 518 et seq.; 150 Cong. Rec. H8704-03, *H8718-19 (Oct. 7, 2004); 150 Cong. Rec. H5581-04, *H5591-92 (July 13, 2004)).

---

[10] See Stipulated Facts ¶¶16-18 for the specifics and percentages of Swisher's quota tobacco purchased in FY 2002 through 2004.

In addition, the Secretary further claims that in "the exercise of its power to lay taxes, Congress may select the subjects of taxation, choosing some and omitting others." (Dkt. 24, citing to <u>Sonzinsky v. United States</u>, 300 U.S. 506, 512 (1937)).  Finally, the Secretary claims that Swisher may benefit from FETRA because in the absence of price supports under the old quota system, prices for domestic tobacco are expected to decline, which may in turn cause prices for foreign tobacco to decline.  This price decline could provide a benefit to companies purchasing domestic and foreign tobacco. (Dkt. 24 at p.14).

In its Cross Motion, Swisher does not directly address the arguments raised by the Secretary; rather, Swisher takes issue with the Secretary's interpretation of the <u>Eastern Enterprises</u> case.  Specifically, Swisher claims that Justice Kennedy provided the plurality with the fifth vote required to strike down the Coal Act as unconstitutional when he found that "the Due Process Clause was violated because the Act unfairly imposed retroactive liability on a private company that had not participated in the conduct that harmed the mine worker retirees, and that could not have anticipated being subject to health care liability after the fact." (Dkt. 34 at p. 25, citing to <u>Eastern Enterprises</u>, 524 U.S. at 547-50).

In the Reply, the Secretary claims that Swisher's due process argument is completely lacking in legal basis because 1) in <u>Eastern Enterprises</u> only Justice Kennedy referenced the Due Process clause and 2) FETRA is "not retroactive in nature, but rather it is simply a condition [of] doing business." (Dkt. 35 at p. 13).  Finally, the Secretary claims that because the Cross Motion failed to address the due process arguments raised by the Secretary, those arguments are now conceded and the Secretary is entitled to summary judgment on this issue.

11

In its Response, Swisher argues that it has not conceded its due process claims. Rather, Swisher contends that these claims are still viable and not simply preserved but "compelling." (Dkt. 37 at p.16).

### C.   **Equal Protection**[11]

Swisher claims that the Secretary violated the Equal Protection Clause[12] by subjecting Swisher to "adverse and differential treatment based on completely irrational rules and regulations which in no way are calculated to further the ends of FETRA." (Dkt. 1, ¶ 103). Specifically, Swisher alleges that FETRA discriminates against it in three ways: (1) the maximum excise tax rate is used for calculating the cigar class share at Step A; (2) at Step B, list price is used to allocate shares among cigar manufacturers, while for other tobacco products the class share is allocated based on units (this, Swisher alleges prevents it from passing the cost on to consumers); and, (3) small and large cigars are treated as like products for the purpose of allocating FETRA liability.

The Secretary responds that Swisher's arguments fail because:

> [T]he only statutorily fixed excise tax rate is used for all tobacco products, not solely for large cigars. Contrary to [Swisher's] misreading of [FETRA], list price is not used in allocating the cigar class's payments. Further, to the extent that [FETRA] treats cigars differently

---

[11]   The parties spent considerable time briefing this issue and provided the Court with detailed support for their positions. During oral argument, however, the parties distilled their positions and honed their arguments. Because the oral arguments represent the essence of the parties' differences, the Court will refer to them when addressing this constitutional claim.

[12] The Equal Protection Clause of the Fourteenth Amendment does not apply to the federal government, but by its terms, applies only to the States. Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954). However, principles of equal protection are applied to the federal government as a component of the Fifth Amendment's Due Process Clause. Id. at 499-500.

than other forms of tobacco at Steps A and B, such distinctions are supported by rational bases. Finally, Congress's decision to group large and small cigars into a single class is not irrational.

(Dkt. 24 at p.15).

### D.     APA Violations

Finally, Swisher claims that the regulations promulgated under FETRA violate the APA because the FETRA assessments imposed on Swisher are "grossly excessive" and not "supported by the preponderance of the information available to the Secretary." (Dkt. 1, ¶ 107). The Secretary moved for summary judgment on these issues claiming that the standard of review under the APA is extremely deferential and that Swisher's arguments under the APA are essentially the same as its due process and equal protection arguments.

Swisher failed to address any of the APA arguments raised by the Secretary. The Secretary claims now that this failure means that Swisher has conceded its APA arguments. The Court agrees. Thus, these claims are no longer before the Court.

## V.     Analysis

The threshold issue in this case is whether FETRA is a tax or an assessment. A tax is usually "imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community." San Juan Cellular Telephone Co. v. Pub. Serv. Comm'n of Puerto Rico, 967 F.2d 683, 685 (1st Cir. 1992). "A 'regulatory fee' is imposed by an agency upon those subject to its regulation." Id. A regulatory fee may serve its purpose directly (by deliberately discouraging behavior by

making it more expensive) or indirectly (by raising money placed in a special fund to help defray an agency's regulation related expenses).  Id.

The Secretary claims that the "FETRA assessment is a tax on Swisher's current production of cigars, no different in the final analysis, than the excise taxes its pays pursuant to the Internal Revenue Code on the cigars it manufactures." (Dkt. 35 at p. 6).  The Secretary claims that the FETRA fee is simply a revenue measure that has an impact on all members engaged in a certain activity.  (Dkt. 35 at p. 4).  Stated differently, the Secretary claims that FETRA creates an "obligation for ongoing manufacturers and importers of tobacco products to pay money to the government in connection with future, not past marketings - that is, the assessments are a condition of doing business in tobacco . . . ." (Dkt. 35 at p. 2).  Swisher, of course, claims that the FETRA fees are not a tax and the Secretary is attempting in vain to fit its argument into "the framework courts have developed for distinguishing between 'assessments' and 'taxes' for purposes of the Tax Injunction Act," 28 U.S.C. § 1341 ("TIA"). (Dkt. 37 at p. 4).

Swisher is referring to San Juan Cellular, which remains the leading case on this issue. The San Juan Cellular court set out a three-factor test to determine whether a case involves a "tax" or "regulatory fee" under the TIA, which precludes federal courts from enjoining collection of any tax under state law.  The three factors are whether the payment is: (1) imposed by an agency or the legislature; (2) imposed upon those being regulated or the community as a whole; and, (3) for the purpose of defraying regulatory costs or to raise revenue.

The problem here is three-fold.  First, the FETRA fee does not conform neatly to the "classic" definitions of "tax" and "regulatory fee."  Second, <u>San Juan Cellular</u> is the formula used for classifying "exactions under the [TIA] - asking whether the payment is a tax to raise general revenue or is a fee incident to regulation." <u>Trailer Marine Transport Corp. v. Rivera</u>, 977 F.2d 1 (1st Cir. 1992).  The TIA is not implicated here.  Third, as will be seen, the three <u>San Juan Cellular</u> factors are not particularly useful in this case.

The first <u>San Juan Cellular</u> factor suggests the FETRA fee is a tax because it is imposed by Congress.  The second <u>San Juan Cellular</u> factor suggests that the FETRA fee is an assessment because it is imposed only on a narrow class of persons - tobacco manufacturers.  In close cases such as this, courts have emphasized the importance of the third factor from <u>San Juan Cellular</u> - the ultimate use of the fees.[13]  <u>See id</u>. at 685; <u>see also</u> <u>Hager v. City of West Peoria</u>, 84 F.3d 865, 870-71 (7th Cir. 1996) ("Rather than a question solely of *where* the money goes, the issue is *why* the money is taken.").  The FETRA fee is neither exclusively paid to defray regulatory costs nor to raise revenue.  The FETRA fee raises money to "enable tobacco farmers to transition into the free market." (Dkt. 35 at p. 4).

---

[13]  Plaintiff informs the Court that the word "tax" is never used in FETRA, only the word "assessment."  However, this fact is not of critical import.  The label given by a state for an assessment or charge is not dispositive. <u>Marcus v. Kansas Dep't. of Revenue</u>, 170 F.3d 1305, 1311 (10th Cir. 1999)(citing to <u>Wright v. McClain</u>, 835 F.2d 135, 144 (6th Cir. 1987) and <u>Cumberland Farms, Inc. v. Tax Assessor</u>, 116 F.3d 943, 946 (1st Cir. 1997) for the same proposition). The Secretary's argument that FETRA was passed as part of a tax bill, the American Jobs Creation Act of 2004, 26 U.S.C. §§ 199 *et seq*., is also not of critical import.  Further complicating the Court's analysis applying the third <u>San Juan Cellular</u> factor is the fact that previous court decisions have "applied the label 'tax' . . . to a range of exactions that might not be commonly described as taxes . . . ." <u>Trailer Marine Transport</u>, 977 F.2d at 5 (collecting cases exemplifying this application).

Essentially, the FETRA fee provides funds to help dismantle a regulatory system, that is, the former federal price support system. Although the hybrid FETRA fee appears to this Court to provide the Federal Government with a financial framework that allows it to avoid directly paying for this free market transition. It is clear that the FETRA fee is more about deregulation than revenue. Certainly payments for the cost of a regulatory system would fall in the regulation category. So then should the cost for dismantling it. Swisher itself wrote and the Court agrees that, "the whole point of FETRA is that the [Department] will continue to regulate tobacco growing for the next decade . . . by way of calculating, allocating and collecting $10 billion in assessments from manufacturers . . . ." (Dkt. 37 at p. 9).

The Court finds that FETRA is primarily concerned with regulation - albeit through the seemingly incongruous aim of aiding in the transition of formerly heavily regulated industry to a free market system. If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax. See State of S.C. *ex. rel* Tindal v. Block, 717 F.2d 874, 887 (4th Cir. 1983) (citing to United States v. Strangland, 242 F.2d 843, 848 (7th Cir. 1957) and Rodgers v. United States, 138 F.2d 992, 994 (6th Cir. 1943)). Having made this initial determination that the FETRA fee is an assessment and not a tax, the Court addresses the parties' substantive constitutional arguments.

## A.    Takings

Often called the Just Compensation Clause, the final Clause of the Fifth Amendment reads that "private property shall not be taken for public use without just compensation. U.S. Const. amend. V. While it confirms the government's authority to confiscate private

property, the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for "public use" and "just compensation" must be paid.  The aim of the Clause is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

"Classic" takings cases involve situations in which the government directly appropriates private property for its own use. See e.g., United States v. Security Industrial Bank, 459 U.S. 70, 78 (1982).  A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint.  As stated by Justice Holmes in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal, 260 U.S. at 415.  However not all regulatory actions will constitute a regulatory taking. Id. at 415.  The large body of Supreme Court cases addressing "physical" takings, for the most part, involves the straightforward application of *per se* rules.

In contrast, the Supreme Court's "regulatory" takings analysis "is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all of the relevant circumstances.'" Brown v. Legal Foundation of Washington, 538 U.S. 216, 233 (2003) (internal citations omitted).  That *ad hoc,* factual inquiry is conducted using three factors of "particular significance" as set forth in Connolly v. Pension Benefit Guar. Co., 475 U.S. at 225 (1986) (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123 (1978)), that is: "(1) the economic impact of the regulation on the claimant; (2) the

17

extent to which the regulation interferes with the claimant's investment backed expectations, and (3) the nature of the governmental action." See also Eastern Enterprises v. Apfel, 524 U.S. 498 (1998).

The fact-intensive nature of takings claims has caused some courts to find summary judgment to be inappropriate; however, where a court finds, as the Court does here, that the material facts have been adequately developed on the record and no genuine issues of material fact exist, summary judgment is appropriate.  See Chang v. United States, 859 F.2d 893, 898 (Fed. Cir. 1988) (holding that even though a regulatory taking analysis is normally *ad hoc* and fact-intensive, the United States may still be entitled to summary judgment as a matter of law).

A proper takings analysis begins by identifying the property interest at stake.  Swisher claims that the property at stake is "a specific sum of money that it once had but that the USDA took from it."  (Dkt. 37 at p. 11).  The Secretary claims that "[t]here is no property interest at stake in an ordinary obligation to pay money." (Dkt. 35 at p. 7).  Both parties rely on the Supreme Court's decision in Eastern Enterprises, to support their positions. Swisher cites to the plurality's takings analysis in Eastern Enterprises to support its position.  The Secretary claims that the precedential import of "Eastern Enterprises with respect to the Taking's Clause is that the Taking's Clause does not apply to the government taking money." (Dkt. 35 at p. 7). The Court agrees with the Secretary's position based on the well-reasoned opinion in Commonwealth Edison Co. v. United States, 46 Fed. Cl. 29 (Fed. Cl. 2000)(Commonwealth Edison I), aff'd, 271 F.3d 1327 (Fed. Cir. 2001), which found that

18

"discerning a controlling rule of law from the welter of conflicting opinions in <u>Eastern</u> requires careful reflection . . . in cases where approaches fundamentally differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court." <u>Commonwealth Edison I</u>, 46 Fed. Cl. at 39. The <u>Commonwealth Edison I</u> court further noted that "numerous courts have recently agreed with this conclusion, observing that <u>Eastern</u> essentially leaves takings law unaffected." <u>Id</u>. at 40 (listing cases in agreement). As its final step, the <u>Commonwealth Edison I</u> court conducted a thorough review of cases (which this Court will not reproduce here) and distinguished <u>Webb's Fabulous Pharmacies v. Beckwith</u>, 449 U.S. 155 (1980).[14] After this review, the <u>Commonwealth Edison I</u> court concluded that "[t]aken together, these cases lead this court to conclude that a government-imposed payment of money cannot result in a compensable taking." <u>Id</u>. at 41. This Court agrees.

In a footnote, the <u>Commonwealth Edison I</u> court also found that were it obliged to apply a takings analysis, using the three factors set out in <u>Connolly</u>, to the special assessment,

---

[14] Swisher argues that "if the money is a concrete obligation and not an abstract obligation . . . if it's definitive, non-speculative and concrete, and it's money that's property, and that's subject to takings analysis." (Dkt. 43, pp. 15-16). Swisher relies on the court's holding in <u>Webb</u>. In <u>Webb</u> the court found that a state statute pursuant to which a county could take the interest accruing on an interpleader fund deposited in the registry of the county court was unconstitutional in violation of the Takings Clause of the Fifth and Fourteenth Amendments. Swisher's reliance on <u>Webb</u> is misplaced. FETRA's assessment is still more akin to the imposition of a financial burden than it is to the specific interest accruing on a specific fund like the one at issue in <u>Webb</u>. In addition, the Court notes that although the financial hardship imposed by FETRA is inescapable, Swisher's yearly assessment is variable. In addition, although FETRA provides a definitive cap of $10.14 billion (with $9.6 billion in expected payments to quota holders and producers and $540 million to cover anticipated losses and eligible expenses), the Secretary has as of September 2006, entered into contracts with producers approximating only $2.9 billion. <u>See</u> <u>Neese v. Johanns</u>, 450 F.Supp.2d 632 (W.D. Va. 2006).

"it would, nonetheless, conclude that there has been no taking here." Id. at 42, n.17.  This Court reaches the same conclusion with the facts before it.  The three Connolly factors are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's investment backed expectations, and (3) the nature of the governmental action.

FETRA may have a $100 million dollar impact on Swisher over the ten-year period that it covers.  Swisher paid over $11 million in FETRA fees during the first calendar year FETRA was enacted.  Swisher claims that these assessments constitute a "considerable financial burden." (Dkt. 34 at p.11).  Swisher claims that FETRA forces tobacco manufacturers to finance "a nearly $10 billion payoff to growers that was entirely unanticipated, was never agreed to by manufacturers, and that is particularly unjust given the seventy years of government largess that the price support system has already provided to growers at manufacturer's expense." (Dkt. 34 at p. 11, citing to the Fraleigh Decl. ¶¶ 4-7). Swisher further claims that it had only a "glancing" interaction with the former price support system because that system dealt mainly with cigarette-type tobacco.  Swisher further claims that its purchases of other kinds of tobacco represent less than one-twentieth of one percent of the tobacco subject to the program . . ." (Dkt. 34 at p. 12, citing to the Fraleigh Decl. ¶¶ 4-7; Stipulated Facts ¶¶ 13-20).  Swisher claims that its responsibility under FETRA is retroactively imposed and "untethered" to its past conduct and responsibility. Turning to the third Connelly prong - the nature and character of the government program - Swisher

characterizes FETRA as a "pay-off" or "wealth transfer" from manufacturers to growers. Swisher further claims that FETRA serves no general public purpose.

In response, the Secretary argues that although "$10 million a year sounds like a lot of money, the fact remains that while we're talking about the FETRA, the effect of the FETRA on Swisher it is less than one-tenth of a cent of tax on each cigar, which means that we're talking about less than a dollar on every thousand cigars. The current maximum excise tax is $48.75 per thousand cigars. [Swisher is] contending that the difference between $48.75 and $49.75 is some sort of extreme burden on them." (Dkt. 43 at p. 31).

With respect to Swisher's expectations, the Secretary also claims, that the manufacture of tobacco is a "heavily taxed industry, so it should certainly come as no shock to any company that is in the business of producing cigars, cigarettes or other tobacco products, that there is a government tax."[15]  Swisher's counter arguments are compelling.  Swisher did participate in the previous tobacco marketing quota and related price support programs and tobacco manufacturing is heavily regulated. Swisher has called the Court's attention on multiple occasions to the provisions of the Master Settlement Agreement (the "MSA").[16]

---

[15]  The Court has already determined that the FETRA fee is an assessment and not a tax; however, the basic principle is the same - an entity engaged in the manufacture of tobacco should not be surprised by a Government assessment.

[16]  The MSA is a settlement agreement between four cigarette manufacturers and the attorney generals of forty-six states, the District of Columbia, the Commonwealth of Puerto Rico, and four other American territories.  The MSA requires the cigarette manufacturers to make payments to the signatory states and other entities and establishes a trust fund to compensate tobacco farmers for losses that may result from an increase in cigarette prices or a decrease in consumption.  (Dkt. 1, ¶ 26).  Swisher alleges that participation in the TTPP constitutes an offset under the MSA for the four cigarette manufacturers.  (Dkt 1, ¶ 29).  See State of North Carolina v. Phillip Morris USA Inc., 618 S.E.2d 219 (N.C. Sup. Ct. 2005), for an

Even though Swisher was not a signatory to the MSA, it was aware of its provisions and the potential impact that it might have.

Congress has made clear that FETRA serves the public purpose of aiding farmers in the difficult and potentially financially ruinous transition to the free market. At the Secretary contends the nature and character of the program "is not to impose a liability on a wrong, rather it is to generate revenue to pay for a program.  FETRA accomplishes that goal by assessing all of the companies in the industry that purchased tobacco in the past and uses the funds raised to pay to help the tobacco growers and producers transition into a free market economy." (Dkt. 43 at p. 32).  The Secretary adds that this act of aiding growers in the transition to the free market, to ensure that they do not fail, provides a benefit to the public. Swisher's attempts to prove that FETRA's fees constitute a taking are as tortured as the Secretary's attempts to avoid having FETRA's fees characterized as assessments.  As the Court stated previously, in-depth analysis on this issue is unnecessary.  To paraphrase the court in <u>Buffalo Teachers Federation v. Tobe</u>, 464 F.3d 362 (2d Cir. 2006), sometimes the net effect of a regulation may "well be to take from Peter to pay Paul, but such burden shifting does not, without more, amount to a regulatory taking." <u>Buffalo Teachers Federation</u>, 464 F.3d  at p. 376 (citing to <u>Connolly</u>, 475 US at 223, for the proposition that "[g]iven the proprietary of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever the litigation required one person to use his or her assets for the benefit

in-depth review of the politics underpinning the MSA and its relation to FETRA.

of another.").  In conclusion then, there is no Takings Clause claim in this case and summary judgment for the Secretary is appropriate.

**B.**    **Due Process**

The standard of review for a due process challenge is well-settled.  The Supreme Court stated in Usery v. Turner-Elkhorn Mining Co., 428 U.S. 1 (1976), "[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."

In Commonwealth Edison Co. v. United States, 271 F.3d 1327 (Fed. Cir. 2001), the court noted that "[w]here the basis for the challenge is retroactivity, the Supreme Court has held that due process is satisfied 'simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" Id. at 1341 (internal citations omitted).  As to the law vs. fact aspect of this issue, the Commonwealth Edison court further noted that:

> In judging the rationality of legislation under the Due Process Clause, an evidentiary trial of facts, . . . is not required.  Rather, . . . [T]he question is whether the legislative conclusion [to enact the statute] was reasonable and supported by the substantial evidence in the record before Congress. In making that determination, we are not to re-weigh the evidence *de novo*, or to replace Congress' factual predictions with our own.  Rather, we are simply to determine if the standard [of review] is satisfied.  If it is, summary judgment . . . is appropriate regardless of whether the evidence is in conflict.

Commonwealth Edison, 271 F.3d at 1341-42 (internal citations omitted).

After conducting an exhaustive review of Supreme Court due process case history, the Commonwealth Edison court, citing to Justice Kennedy in Eastern Enterprises, stated that "'[s]tatutes may be invalidated on due process grounds only under the most egregious of circumstances. Commonwealth Edison, 271 F.3d at 1345 (quoting from Eastern Enterprises, 524 U.S. at 550).[17]   The Commonwealth Edison court then identified two factors, which if met, would render "even severe retroactive obligations . . . rational and . . . constitutional under the Due Process clause." Id. at 1346.  These factors are if "(1) Congress reasonably concluded that the party subjected to retroactive obligations benefitted from activity that contributed to a societal problem, and liability is not disproportionately imposed on that party; and (2) the imposition of retroactive liability would not be contrary to that party's reasonable expectations." Id.  (noting that legislation may be constitutional if either of the two conditions is satisfied, but that the court need not reach that decision in that case because both conditions were present).

The Commonwealth Edison court succinctly concluded that "[i]n short, legislative facts control the analysis.  In these Due Process cases the federal courts are not assigned the task of making policy, determining a fair outcome, or determining the actual state of facts. We are charged simply with determining whether the congressional action was rational." Id. at 1342.

---

[17]   The Commonwealth Edison court further noted that "[a]lthough such 'most egregious circumstances' do not exist *unless* the legislation is severely retroactive, they do not exist *merely* because the legislation is severely retroactive and costly." Commonwealth Edison, 271 F.3d at 1345-46.

Swisher's due process arguments suffer from three fatal flaws - first, Swisher's due process analysis relies on <u>Eastern Enterprises</u>; second, Swisher has not demonstrated that FETRA is either arbitrary or irrational; and, even assuming that FETRA is retroactive, it would still be rational under the two-factor test enumerated in <u>Commonwealth Edison</u>.

The Secretary rightly notes that Swisher's due process arguments are scant. Instead of providing substantive arguments on the issue, Swisher piggybacks its due process arguments with its takings analysis under the three factors set out in <u>Connolly</u>. Swisher places too much reliance on <u>Eastern Enterprises</u>. As the court in <u>Commonwealth Edison</u> noted, "[t]he District of Columbia Circuit has concluded that the plurality and concurrence in <u>Eastern Enterprises</u> cannot be combined into a single holding on the Due Process issue." <u>Id</u>. at 1344, n.14 (citing to <u>Ass'n of Bituminous Contractors v. Apfel</u>, 156 F.3d 1246, 1254-55 (D.C. Cir. 1998), which found that "Justice Kennedy's concurrence in the judgment is of no help in appellant's efforts to cobble together a due process holding from <u>Eastern Enterprises</u> fragmented parts . . . . [Justice Kennedy] alone was willing to invalidate economic legislation on the ground that it violated the Due Process Clause. And, as should be obvious, Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's takings analysis.").[18]

Congress enacted FETRA to help farmers transition from the old tobacco quota and price support systems to a market based system. Congress thought this was necessary to aid

---

[18] The <u>Bituminous</u> court also stated that, "although the plurality noted that 'analysis of legislation under the Takings and Due Process Clauses is correlated to some extent . . . a correlation is not an equivalency." <u>Bituminous</u>, 156 F.3d at 1254.

the largely aging quota holders who relied on quota leases to maintain income and to stem the economic ripple effect facing large tobacco-producing states, like North Carolina and Kentucky, from the MSA's decreasing the demand for domestically produced tobacco.  See Matthew Nis Leerberg, Takings and Statutory Entitlement: Does the Tobacco Buyout Take Quota Rights Without Just Compensation?, 55 DUKE L.J. 865, 871 (2006).  This clearly is a legitimate purpose for enacting FETRA.  However, even if this were not a legitimate purpose, "the challenged legislation . . . is to be upheld if there is any conceivable rational basis supporting it, whether or not the Congress had that particular basis in mind when the legislation was enacted.  FCC  v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993).

The means employed by Congress to facilitate the goals of FETRA cannot be called "irrational."  Congress tapped tobacco manufacturers who had purchased tobacco under the old support system to bear some of the costs associated with dismantling that system.  Swisher does not dispute that it purchased tobacco under the old system, rather it claims that its purchases were minimal.  Past participation is a rational basis for requiring Swisher to participate in FETRA.

Swisher continually claims that FETRA is retroactive.  The Secretary claims that Swisher is not retroactive, rather it is simply "a condition of doing business." (Dkt. 35 at p. 13).  The Court need not make a final determination, because even giving Swisher the benefit of the doubt about FETRA's retroactivity, Swisher's due process arguments fail under the two-factor test enumerated in Commonwealth Edison.

Congress reasonably concluded that the party subjected to retroactive obligations benefitted from activity that contributed to a societal problem, and liability is not disproportionately imposed on that party.  Swisher claims, and the Court does not disagree entirely, that Swisher does not appear to have directly benefitted from its participation in the old quota system.  However, some of the purposes of the old quota system could be viewed as beneficial to Swisher.  The quota system was designed in part to combat the lack of "orderly marketing" of tobacco by ensuring that tobacco manufacturers would have an ample but not excessive supply of acceptable tobacco.  <u>See</u> Nis Leerberg, 55 <span style="font-variant:small-caps">Duke L.J.</span> at 868 (2006).  In addition, Swisher purchased foreign grown tobacco, which is far cheaper than domestically grown tobacco.  Foreign grown tobacco was so much cheaper than domestically grown tobacco, in part, because of the old quota system and price supports.  It cannot be denied that Swisher, as it has acknowledged, benefitted from the ability to purchase cheap foreign tobacco.  The Court has already noted that although $10 million a year may sound egregious that "impact" is actually "one-tenth of a cent of tax on each cigar . . . ." (Dkt. 43 at p.31). This is not an extreme, or even necessarily a disproportionate, liability.

The second factor is that the imposition of retroactive liability would not be contrary to that party's reasonable expectations. As noted above, the tobacco industry was traditionally and is currently heavily regulated.  The MSA was signed on November 16, 1998.  The MSA was expected to reduce demand for tobacco, which it did.  The market for domestically grown tobacco shrank dramatically from 1998 to 2004. <u>See</u> Nis Leerberg, 55 <span style="font-variant:small-caps">Duke L.J.</span> at 866 (2006).  From 1997 until 2004, when FETRA was signed into law, these

acknowledged problems within the tobacco industry prompted members of Congress to introduce more than twenty tobacco buyout bills.  See State of North Carolina v. Phillip Morris USA Inc., 618 S.E.2d 219 (N.C. Sup. Ct. 2005).  It is clear from the sheer volume of legislation generated to address fallout from MSA that anyone affiliated with tobacco would be aware that sooner or later Congress was going to act to aid tobacco growers.  As a past purchaser under the old system, Swisher might reasonably be expected to participate in the dismantling of that system.

In upholding the Federal Claims court's dismissal of due process and equal protection claims, the court in Maine Yankee  Atomic Power Co. v. United States, 271 F.3d 1357, 1359-60 (Fed. Cir. 2001), stated that although the plaintiffs may have preferred a different system, "Congress's assignment of liability for a past problem to past consumers does not stretch the limits of the reasonable."  That sentiment holds true here.  FETRA does not violate the Due Process Clause and the Secretary is entitled the summary judgment on this issue.

### C.    Equal Protection

The Supreme Court has warned that,"[w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC  v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).  Rather, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental

constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable* state of facts that *could* provide a rational basis for the classification." Id. (citations omitted) (emphasis added).

This standard of review, i.e., rational basis review, is a "paradigm of judicial restraint." Id. So, where there are "plausible reasons for Congress' action," the court's inquiry must be "at an end." U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980); see also BellSouth Corp. v. FCC, 162 F.3d 678, 691 (D.C. Cir. 1998) (same); Schweiker v. Wilson, 450 U.S. 221, 230 (1981) (a court's inquiry is limited to asking whether "the legislation classif[ies] the persons it affects in a manner rationally related to legitimate government objectives").

In this arena, government action bears "a strong presumption of validity" and the party challenging it "ha[s] the burden 'to negative *every conceivable basis* which might support it.'" Beach Commc'ns, 508 U.S. at 314-15 (citations omitted) (emphasis added). That is, so long as the reviewing court can conceive of facts which reasonably justify the classification at issue, governmental action survives rational basis review. Id. at 315. Such deference is afforded the government because "'the legislature must necessarily engage in a process of line-drawing.'" BellSouth Corp., 162 F.3d at 692 (quoting Fritz, 449 U.S. at 179). "Defining the class of persons subject to a regulatory requirement - much like classifying governmental beneficiaries - 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than

judicial, consideration.'" Beach Commc'ns, 508 U.S. at 315 (quoting Fritz, 449 U.S. at 179); see also Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 365 (1973) ("Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and ability to function.") (citation omitted).

Under FETRA there is a two-step process to determine a manufacturer's quarterly assessment.  First, the overall amount needed to make transition payments to producers is allocated among the six classes of tobacco set out in FETRA, i.e., cigarettes, cigars, snuff, roll-your-own, chewing and pipe ("Step A").  7 U.S.C. § 518(c)(1).  Second, within each class, the amount required to be paid by each manufacturer is allocated on a pro rata basis based upon each manufacturer's share of gross domestic volume as calculated under the statute ("Step B"). 7 U.S.C. § 518(e).

Swisher's Step A objection is that the maximum excise tax is used for calculating the cigar share of the portion.  (Dkt. 43 at p. 33).  Specifically, Swisher claims that the USDA's practice of applying maximum excise tax rates to large cigars, but actual tax rates to every other type of tobacco product, violates the equal protection principle embodied in the fifth Amendment.  (Dkt. 34 at p. 28).  Swisher further claims that "[b]ecause the USDA uses the maximum excise tax rate for large cigars, the cigar class necessarily receives a larger portion of the Step A burden than it would receive if a [sic] actual excise taxes were used uniformly for all tobacco products, including large cigars."  (Dkt. 34 at p. 28).  Swisher acknowledges that the "Government is entitled to make approximations and create proxies in allocating a

financial burden among different groups;" however, Swisher concludes that the Government "cannot treat like products differently without some affirmative rationale." (Dkt. 34 at p. 29-30).

The Secretary explained Congress's rationale in Step A by stating that:

> Plaintiff would like you to believe that the actual excise tax is the loadstone, but the fact is that what Congress did was take the fixed tax which is set in the statute for each of these items. It is true that there is only one number for everything except large cigars. That's the number that Congress took. Whatever the actual excise tax, whatever the fixed excise tax for cigarettes, that's what Congress used. When it came to large cigars, large cigars are inherently different from a taxing perspective from all those other products because they are not subject to just one level of taxation. They have a sliding scale amount of taxation that goes up. It's approximately 20% percent of the value and it caps out at $48.75 per thousand cigars. Congress determined that it should use a fixed rate for large cigars, just like it was using a fixed rate for every other group of tobacco products. This was rational because it enables easy comparison from year to year and much easier calculations of the class A. These are administrative conveniences that are sufficient to satisfy rational basis review.
> The question then becomes, was it rational to pick the particular fixed rate that they picked in this instance . . . They picked the rate that was in the statute. . . . It was also rational for the Congress to rely on the maximum excise tax rate because it did not have readily available to it actual excise tax rates at the time that it created the Step A distinctions in the statute.

(Dkt. 43, pp. 33-35).

The Secretary further claims that:

> Another reason that it is rational for the Congress to have used the maximum excise tax rate, a fixed rate, is because it enables easier year-to-year comparisons regarding the sales. If the Congress had to deal with changing from year to year, both the number of cigars that were sold and what tax rates were being applied, it is much more difficult to calculate the relative market on a year-to-year basis. When you fix the excise tax rate, then the only thing that is changing is the volume of sales, which

> makes tracking year-to-year much easier, which again is an administrative convenience that is sufficient to justify a rational basis."

(Dkt. 43 at p. 35).

Swisher objects to Step B because large and small cigars are treated as part of one group. Specifically, Swisher argues that the Step B "method of allocating the intra-class share of the class's overall payment violates principles of equal protection because it is based on volume date, i.e., number of cigars sold, thereby treating all types of cigars the same regardless of how much the cigars cost." (Dkt. 35 at p. 17). Swisher informed the Court about the differences between large and small cigars - as to size, shape, weight cost and tax treatment. Little cigars are subject to an excise tax exactly like cigarettes - a flat tax. Large cigars are subject to the variable rate discussed above. Swisher informed the Court that it is the most successful manufacturer of little cigars domestically and internationally. (Dkt. 43 at p. 21). So fundamentally, Swisher is a little cigar company. At Step B, for volume purpose, Congress treats little and big cigars the same. Swisher argues that this treatment has the effect of increasing Swisher's responsibility relative to other cigar companies.

The Secretary responds that Congress rationally determined that each set of tobacco products should be treated as one group. "All of the cigarettes are grouped together, all of the snuff, and all of the cigars." (Dkt. 43 at p. 36). The Secretary acknowledges that not all cigars are the same cost, but also claims that not all cigarettes are the same price. For administrative ease, Congress "decided the easiest thing to do was to have groups that simply included the entire set of each tobacco product." (Dkt. 43 at p. 37). As the Secretary argued:

Swisher's final contention is that it is inconsistent to treat small and large cigars together at Step B when they are treated separately at Step A.  The Secretary responds that: As long as both decisions had rational bases, the statute is constitutional.  In this instance, it seems clear that Congress treated small and large cigars separately at Step A because Step A utilizes excise tax rates to calculate the inter-class percentages, and small and large cigars have different excise tax rates.  Thus, it would have been difficult to group small and large cigars together, so it was rational to separate them.  At Step B, however, excise tax rates do not come into play.  Rather, at Step B allocation is based on volume, which is measured on the same basis, per stick, for both small and large cigars.  It was rational therefore, to combine all cigars into one group.

It was not irrational for Congress to use excise taxes at Step A and not at Step B.  At Step A, Congress was distinguishing among several different classes of products that were not similar to one another.  Some products' volume was measured in pounds, others' in number of sticks sold . . .Thus, the products were not comparable, and Congress used excise tax rates to convert them into like units of measurement to enable it to make comparisons (allocations) between the classes at Step A." However, at Step B, allocation were made among companies within the same product class, whose volume is measured in the same units . . . . [Thus,] it was rational to apply the same method of class B assessment to each of the product categories, based on the number of taxable units, rather than try to come up with some assertedly "fairer" but more cumbersome system that would make individualized assessments of value assigned to particular sticks in the market place.  Such individualization is simply not required under the rational basis test.

(Dkt. 35 at p.19).

Having laid out the parties' arguments, the Court understands Swisher's frustration with FETRA. The Court further appreciates that had the implementing regulations been formulated in the manner Swisher desires, they might be more fair to Swisher.  However, in the context of equal protection, sympathy and potentially better methodology cannot factor into our analysis. During oral argument, Swisher's counsel noted on the record that his

client's equal protection claims are strong and compelling. (Dkt. 43 at p. 22). However, he also noted that such claims are rarely upheld.

Under the principles espoused above, FETRA's implementing regulations are constitutional. Swisher has failed to meet its burden of negating the Secretary's proffered rationales. The ultimate wisdom of the implementing regulations might be questioned, but that is not sufficient to render the regulations unconstitutional or to create an issue of material fact for purposes of surviving summary judgment. As the court stated in <u>Brown-Forman Co. v. Commonwealth of Kentucky</u>, 217 U.S. 563, 573 (1910), "If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of equal protection under the law.'" Administrative efficiency has been found to provide a rational basis. <u>See</u> <u>Partlo v. Johanns</u>, 2006 WL 1663380 at *17 (D.D.C June 11, 2006) (internal citations omitted).[19]

The FETRA implementing regulations are rationally related to a legitimate government purpose and do not violate the Equal Protection Clause of the Constitution, thus the Secretary is entitled to summary judgment on this issue.

## VI.    Conclusion

Underlying Swisher's arguments is the notion that the funds Swisher is required to pay under FETRA are more akin to an exaction than an assessment. An exaction is defined as a "fee, reward, or contribution demanded or levied with severity or injustice." <u>Merriam-Webster's On-Line Dictionary</u>, available at http://www.m-w.com/dictionary/exaction. The

---

[19] The court's analysis in <u>Partlo</u> is very instructive on the issues presented by this case.

Court sympathizes with Swisher.  However unpalatable, seemingly unjust and onerous FETRA is to Swisher, and regardless of the fact that it may have been crafted by lobbyists to relieve cigarette manufacturers of their financial burdens under the MSA, it is not unconstitutional.

In accordance with the Court's findings above, summary judgment is appropriate for the Secretary on all counts in the Complaint.  The Secretary's Motion for Summary Judgment (Dkt. 24) is **GRANTED** and Swisher's Cross Motion for Summary Judgment (Dkt. 34) is **DENIED**.  The Clerk is **DIRECTED** to enter judgment for the Secretary and to **CLOSE** this case.

**DONE and ORDERED** in Chambers in Jacksonville, Florida on this 27th day of November 2007.

Copies to:  Counsel of Record

JOHN H. MOORE II
United States District Judge